**CHENEGA MANAGEMENT, LLC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 10–221C.**

United States Court of Federal Claims.

Sept. 14, 2010.

560

Kenneth A. Martin, Martin & Associates, McLean, VA, for Plaintiff.

Alex P. Hontos, United States Department of Justice, Civil Division, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER[1]

SUSAN G. BRADEN, Judge.

This bid protest arises following a pre-award challenge at the Government Accountability Office ("GAO"), a suspension of the procurement pending the investigation of the Office of Special Investigation of the United States Air Force, and a subsequent post-award GAO protest.

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

I. RELEVANT FACTS. . . . . . . . . . . . 561
 A. The Solicitation. . . . . . . . . . . 561
 B. The Source Selection Procedure. . . . . . 562
 1. Source Selection Personnel. . . . . . 562
 2. The Evaluation Criteria. . . . . . 562
 a. Past Performance. . . . . . 563

1. This Memorandum Opinion and Final Order originally was filed under seal on September 2, 2010. The parties were given until September 10, 2010 to notify the court of any redactions. All requested redactions are denoted with brackets. In addition, some names have been changed at the request of the parties.

 b. Mission Capability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .563
 3. Mission Capability Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .564
 4. Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .564
 C. The Source Selection Evaluation Team's Initial Analysis. . . . . . . . . . . . . . .564
 D. Source Selection Authority's Evaluation And Award. . . . . . . . . . . . . . . . . .565
 E. The Initial Protest Before The General Accounting Office And
 Resolution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .566
 F. The Investigation By The United States Air Force. . . . . . . . . . . . . . . . . . . .567
 G. The Source Selection Authority's Final Award Decision. . . . . . . . . . . . . . . .568

II. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .569
 A. Subsequent Protests Before The Government Accountability Office. . . . . .569
 B. Before The United States Court Of Federal Claims. . . . . . . . . . . . . . . . . . . .569

III. JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .570
 A. Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .570
 B. Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .571

IV. APPLICABLE STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .573

V. SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD. . . . . . . . . . . . . . .574

VI. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .576
 A. Plaintiff's Motion For Judgment On The Administrative Record. . . . . . . . .576
 B. The Government's Cross–Motion And Response. . . . . . . . . . . . . . . . . . . . . . .578
 C. Plaintiffs Response And Reply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .579
 D. The Government's Reply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .580
 E. The Court's Resolution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .581
 1. Plaintiff Failed To Establish Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .581
 2. Plaintiff Failed To Establish A Violation Of Federal Acquisition
 Regulation 3.101–2—Acceptance Of A Gratuity And 5 C.F.R.
 § 2635.203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .582
 3. Plaintiff Failed To Establish A Violation Of Federal Acquisition
 Regulation 1.602–2—Unequal Treatment. . . . . . . . . . . . . . . . . . . . . . . .585
 4. Plaintiff Failed To Establish The Air Force Evaluators Were Not
 Qualified. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .587

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .588

## I. RELEVANT FACTS.[2]

### A. The Solicitation.

On April 20, 2009, the United States Air Force Air Combat Command[3] ("Air Force") issued Solicitation No. FA4890–09–R–0008 ("RFP" or "Solicitation"), seeking proposals for a firm fixed-price contract to acquire command and control "contract academic training, courseware development, distance learning services, and staff support services"

for various commands and organizations throughout the Air Force. AR Tab 2, at 72, 204.

The Solicitation called for a Fixed–Price with Cost–Reimbursable Line Items contract. AR Tab 2, at 174. The term was a 30–day transition period to commence on October 1, 2009, followed by an 11–month base period, and four one-year options through September 30, 2014.[4] AR Tab 2, at 204.

---

**2.** The facts cited herein were derived from the April 26, 2010 Administrative Record ("AR Tab 1–15, at 1–2099").

**3.** The April 20, 2009 Solicitation describes the Air Combat Command as "the primary provider of air combat forces to America's combatant commanders. As a force provider, [it] organizes, trains, and equips combat-ready forces for rapid deployment and employment while ensuring

strategic defense forces are ready to meet the challenges of peacetime air sovereignty and wartime/contingency operations." AR Tab 2, at 204.

**4.** The April 20, 2009 Solicitation provided that the Contract term would commence on September 1, 2009, but this date subsequently was pushed back 30 days by a May 12, 2009 Amendment. AR Tab 2, at 467–72.

Based on an independent government estimate, the Air Force budgeted $45.5 million to fund this procurement,[5] including the phase-in period and all option years. AR Tab 2, at 204.

The Solicitation also provided that the Air Force would award a contract on a "best value"[6] basis, using negotiated procurement procedures in accordance with FAR Part 15, "Contracting by Negotiation," and Air Force Supplemental Federal Acquisition Regulation ("AFFARS") 5315 (same title). AR Tab 2, at 177. The awardee would be the responsible offeror "whose proposal conforms to the [S]olicitation's requirements, and is judged by an integrated assessment of the proposal based on evaluation criteria to represent the best value to the Government." AR Tab 2, at 177.

The Solicitation also stated that the Air Force intended to make the award based on initial proposals and without the benefit of "discussions."[7] AR Tab 2, at 177. If the Air Force determined that discussions were "in the best interest of the Government," a competitive range would be established. AR Tab 2, at 177. Thereafter, the Air Force would conduct discussions with offerors selected for the competitive range by written Evaluation Notices ("EN") "for purposes of clarifications, communications, or discussions." AR Tab 1, at 10; AR Tab 2, at 177; AR Tab 7, at 1690. Those offerors then would be given an opportunity to respond to the ENs and submit Final Proposal Revisions ("FPR"). AR Tab 2, at 177. Offeror responses to the ENs and FPRs would be considered by the Air Force in making a "best value" determination. AR Tab 2, at 177.

## B. The Source Selection Procedure.

The source selection procedure for this procurement is governed by a March 31, 2009 Source Selection Plan, pursuant to which a Source Selection Evaluation Team ("SSET") was appointed to "[c]onduct [ ] an in-depth review and evaluation of each proposal and any subsequently submitted information or proposal revisions against the factors and sub-factors and other solicitation requirements, and report [ ] findings to [the Source Selection Authority]." AR Tab 1, at 1, 10.

### 1. Source Selection Personnel.

On February 10, 2009, [redacted], Commander of the Air Combat Command Training Support Squadron ("ACC TRSS") was appointed as the Source Selection Authority ("SSA") for this acquisition. AR Tab 1, at 1, 8. The SSA was required to oversee the procurement process and make a best value award decision.[8] AR Tab 1, at 9–10. The SSA appointed [redacted] of the ACC TRSS Acquisition Division as the Chair of the SSET, who in turn selected the members of the SSET. AR Tab 1, at 1, 8. The SSET was comprised of: the SSET Chair; the Contracting Officer ("CO"), Ms. Jacquelyn Cooper; Technical Team; Pricing Team; and Performance Confidence Assessment Group ("PCAG"). AR Tab 1, at 10–13, 24–25. The PCAG was responsible for the past performance assessment. AR Tab 1, at 13.

### 2. The Evaluation Criteria.

The Solicitation stated that proposals would be evaluated using four evaluation factors: (1) Past Performance; (2) Mission Ca-

---

5. The Solicitation also stated that:
 This figure is provided for informational purposes only. Although the Government does not anticipate obtaining any further funding, this budget figure in no way restricts the Government's right to award to a higher or lower priced offer if that offer is determined to represent the best value as evaluated in accordance with this solicitation.
 AR Tab 2, at 204.

6. FAR 2.101 provides: " 'Best value' means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." 48 C.F.R. § 2.101.

7. In the context of a federal procurement, the term "discussions" has a specific legal definition: "When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions." 48 C.F.R. § 15.306(d).

8. For most procurements, responsibility for the source selection decision is delegated to the contracting officer. *See* FAR 15.303. In more complex procurements, such as this one, the agency head may delegate this responsibility to the "Source Selection Authority" or SSA. *Id.; see also* Ralph C. Nash Jr., The Government Contracts Reference Book 483 (2d ed. 1998).

pability; (3) Mission Capability Risk; and (4) Price. AR Tab 2, at 178. The relative importance of each of these evaluation factors follows:

> In regard to the factors, Past Performance is equal in importance to Mission Capability. Mission Capability Risk is less important than both Past Performance and Mission Capability. The combination of Past Performance and Mission Capability is significantly more important than price. Price is the least important factor. However, price will substantially affect the source selection decision.

AR Tab 2, at 178.

### a. Past Performance.

The first evaluation factor, Past Performance, involved "an evaluation of an offeror's present and past performance record so that the Government can make a determination about its confidence in the offeror's probability of successfully performing as proposed." AR Tab 2, at 178. The PCAG evaluated the Past Performance Factor first by assigning values to the relevancy of an offeror's past and present performance. AR Tab 2, at 179. After assessing the relevancy of past and present performance, the PCAG assigned each offeror a rating that represented "an overall evaluation of contractor performance." AR Tab 2, at 179–80. Offerors would be assigned one of the following ratings for past performance: "Substantial Confidence," "Satisfactory Confidence," "Limited Confidence," "No Confidence," or "Unknown Confidence." AR Tab 2, at 180.

### b. Mission Capability.

Of equal importance to the Past Performance Factor was the Mission Capability Factor. AR Tab 2, at 178. The Mission Capability Factor consisted of four sub-factors: (1) Manning Requirements and Analysis; (2) Training Management and Approach; (3) Courseware Development Approach, Instructional Systems Development Management Plan ("ISDMP") and Quality Program Plan; and (4) All Other Plans and Contractor-Furnished Equipment. AR Tab 2, at 178, 182. The Solicitation listed sub-factors in descending "order of importance." AR Tab 2, at 178, 182.

Every proposal was assigned a rating for each of these sub-factors, using a color rating scheme, depicted below:

**Mission Capability Technical Ratings**

| Color | Rating | Definition |
| --- | --- | --- |
| Blue | Exceptional | Exceeds specified minimum performance or capability requirements in a way beneficial to the government. A proposal must have one or more strengths and no deficiencies to receive a blue. |
| Green | Acceptable | Meets specified minimum performance or capability requirements. A proposal must have no deficiencies to receive a green but may have one or more strengths. |
| Yellow | Marginal | There is doubt regarding whether an aspect of the proposal meets a specified minimum performance or capability requirements, but any such uncertainty is correctable. |
| Red | Unacceptable | Fails to meet specified minimum performance or capability requirements. The proposal has one or more deficiencies and is not awardable. |

AR Tab 2, at 182.

In order to support a rationale for the color rating, the Technical Team was required to identify specific aspects of a proposal as either a "strength, weakness, uncertainty, or deficiency" according to the following definitions:

| Supporting Rationale | Definition |
| --- | --- |
| Strength | A significant aspect of an offeror's proposal that has merit and exceeds specified performance or capability requirements in a way that is advantageous to the government, and either will be included in the contract or is inherent in the offeror's process. |

| | |
|---|---|
| Weakness [9] | A flaw in the proposal that increases the risk of unsuccessful contract performance. |
| Uncertainty | A doubt regarding whether an aspect of the proposal meets a material performance or capability requirement. |
| Deficiency | A material failure of a proposal to meet a government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |

AR Tab 7, at 1695.

### 3. Mission Capability Risk.

The Mission Capability Risk factor required an assessment of "the degree to which an offeror's proposed approach to achieving the requirements of the Mission Capability sub-factors may involve risk of disruption of schedule, increased cost or degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance." AR Tab 2, at 184. The Technical Team assessed Mission Capability Risk for all Mission Capability sub-factors, but an overall factor-level risk rating was not assigned. AR Tab 2, at 184. The Mission Capability Risk associated with each Mission Capability sub-factor was assigned one of the following four adjectival ratings: "Low" (meaning a low level of risk), "Moderate," "High," or "Unacceptable." [10] AR Tab 2, at 184.

### 4. Price.

The objective of the fourth and least important Price factor was "to ensure that the final agreed-to price is fair and reasonable." AR Tab 2, at 184. The Pricing Team's assessment of "reasonableness" focused on the "total evaluated price," and involved an integrated consideration of four aspects of price: a reasonableness determination governed by the price analysis under FAR 15.404–1(b); [11] affordability; whether "prices proposed are materially unbalanced between line items or sub-line items;" and "completeness in relation to the offeror's proposed technical and management approach." AR Tab 2, at 184.

### C. The Source Selection Evaluation Team's Initial Analysis.

On May 21, 2009, the Air Force received eight timely proposals in response to the April 20, 2009 Solicitation: Chenega Management, LLC ("Chenega"); Delaware Resource Group of Oklahoma, LLC ("DRG"); Offeror 3; [redacted]; [redacted]; [redacted]; [redacted]; and [redacted]. AR Tab 7, at 1702–03, 1784. On June 25, 2009, the SSET presented the results of the initial evaluation to the SSA, together with an Initial Proposal Analysis Report ("Initial PAR"), explaining the SSET's evaluations of each offeror's proposal. AR Tab 7, 1690, 1788. On the basis of these initial findings, on June 25, 2009 the SSET recommended the establishment of a competitive range that included two offerors: DRG and Offeror 3. AR Tab 7, at 1782, 1784; AR Tab 11, at 1968. A summary of the SSET's initial findings for Chenega, DRG, and Offeror 3 is set forth in the following table:

### Summary Of Proposal Evaluations In The Initial PAR

| Factor | | Chenega | DRG | Offeror 3 |
|---|---|---|---|---|
| Past Performance | | [redacted] | [redacted] | [redacted] |
| Mission Capability Technical Rating/ | Manning Requirements and Analysis | [redacted] | [redacted] | [redacted] |
| Mission Capability Risk Rating | Training Management and Approach | [redacted] | [redacted] | [redacted] |

9. A proposal "weakness" could be characterized as "Significant," if the Technical Team determined that a weakness "is a flaw that appreciably increases the risk of unsuccessful contract performance." AR Tab 7, at 1695.

10. The Solicitation also provided that "A plus '+' rating may be used, when risk is evaluated to be in the upper boundaries of a Mission Capability Risk Rating, but is not high enough to merit the next inferior rating." AR Tab 2, at 184.

11. FAR 15.404–1(b)(1) defines "price analysis" as: "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." 48 C.F.R. § 15.404–1(b)(1).

| | | | |
|---|---|---|---|
| CWD Approach, ISDMP and QPP | [redacted] | [redacted] | [redacted] |
| All Other Plans and CFE | [redacted] | [redacted] | [redacted] |
| **Price (Total Proposed Price)** | [redacted] | [redacted] | [redacted] |

AR Tab 7, at 1706, 1777–78.

The competitive range consisted of the two most highly rated proposals "deemed capable of meeting or exceeding the [G]overnment's minimum requirements." AR Tab 7, at 1784. The SSET also recommended that the Air Force open discussions with DRG and Offeror 3 and issue ENs to "address weaknesses, uncertainty, and price questions." AR Tab 7, at 1827. On that same date, the SSA concurred with the SSET's findings and set the competitive range as DRG and Offeror 3. AR Tab 7, at 1690, 1784. The SSA also approved the opening of discussions through the issuance of the ENs.[12] AR Tab 7, at 1782.

On July 1, 2009, the CO sent a letter to Chenega to advise the firm that it was not included in the competitive range, because the SSET ratings indicated a "[redacted.]" AR Tab 3, at 481; *see also* AR Tab 7, at 1785. In particular the Mission Capability and Risk Ratings indicated that "[redacted]." AR Tab 7, at 1785. Chenega's proposal received [redacted]. AR Tab 3, at 481; AR Tab 7, at 1720–30. On that same day, Chenega requested a post-award debriefing.[13] AR Tab 13, at 1982–83.

### D. Source Selection Authority's Evaluation And Award.

After the competitive range was established, the SSA "approved the opening of discussions which allowed the [G]overnment to issue questions and requests for information to offerors in the form of ENs and allowed offerors to revise their proposal." AR Tab 8, at 1832. On June 30, 2009, the CO sent ENs to DRG and Offeror 3 and invited both offerors to revise their proposal. AR Tab 3, at 498–99, 553–54.

On July 10, 2009, DRG and Offeror 3 submitted EN responses and proposal revisions to the Air Force. AR Tab 3, at 522–49, 566–73. On August 3, 2009, the SSET issued an Interim PAR reflecting the evaluation of DRG and Offeror 3's EN responses and proposal revisions. AR Tab 8, at 1828, 1832. The Interim PAR made the following changes to the initial ratings for Offeror 3's proposal: (1) the Courseware Development Approach and ISDMP and Quality Program Plan subfactor changed from "Acceptable/Green" to "[redacted];" (2) the Courseware Development Approach and ISDMP and Quality Program Plan risk rating changed from "[redacted]" to "[redacted];" (3) and the All Other Plans and Contractor-Furnished Equipment risk rating changed from "[redacted]" to "[redacted]." AR Tab 8, at 1834. The SSET, however, left the subfactor evaluation ratings of DRG's proposal unchanged. The SSET recommended to the SSA, that discussions be closed and that FPRs be requested from DRG and Offeror 3. AR Tab 8, at 1855. Following the Final Proposal Revision Briefing, on August 14, 2009, the SSA approved closing discussions and issued requests for FPRs. AR Tab 9, at 1882. On August 19, 2009, both Offeror 3 and DRG informed the CO that they had no further revisions. AR Tab 3, at 587; AR Tab 9, at 1882.

On August 27, 2009, the SSET issued a Final PAR reflecting the SSET's final evaluation and recommendation to the SSA. AR Tab 9, at 1879–1901. In the Final PAR, the SSET recommended that a contract be awarded to Offeror 3 ("the Contract"). AR

---

12. The SSA's decision, however, was not formally documented until the issuance of a "Competitive Range Determination and Findings," signed on July 20, 2009. AR Tab 7, at 1787.

13. According to the Solicitation, an offeror may request either a pre-award or a post-award debriefing. AR Tab 2, at 171. A post-award debriefing is to be conducted in accordance with FAR 15.506. AR Tab 2, at 171. It appears from the Administrative Record that Chenega did not receive a debriefing until after the SSA issued the Source Selection Decision on January 14, 2010.

Tab 9, at 1899. The SSET planned to present this recommendation to the SSA at a "Decision Briefing" scheduled for September 8, 2009. AR Tab 9, at 1901.

### E. The Initial Protest Before The General Accounting Office And Resolution.

On September 4, 2009, Chenega filed an initial bid protest at the GAO challenging its elimination from the competitive range, because: "[t]he RFP and the source selection that ACC performed pursuant to it is irreparably tainted by an unlawful bri[b]e offered to and accepted by a senior procurement official with responsibilities related to the procurement"[14] AR Tab 10, at 1932. The Air Force immediately suspended the source selection process, pending resolution of the protest. AR Tab 11, at 1969.

Specifically, Chenega alleged that, in January 2009, Lieutenant Colonel ("Lt. Col.") E., the Director of Operations ("DO") of the 607 Air Control Squadron ("ACS") at Luke AFB, received Super Bowl tickets as a gratuity from the President of Offeror 3, Mr. S. AR Tab 10, at 1920, 1934–36. Chenega claimed that Mr. Milorad Vuckovich, a CTSC employee, who served as a contract Weapons Director Instructor at the 607 ACS for the incumbent contractor, witnessed Mr. S. and Lt. Col. E. in line together to purchase Super Bowl tickets on January 21, 2009.[15] AR Tab 10, at 1961. According to the protest, Lt. Col. E. was a "senior procurement official with responsibilities related to the procurement," who "had the power to directly and indirectly influence the award of the contract in Offeror 3's favor" by virtue of his authority to appoint and supervise at least two members of SSET. AR Tab 10, at 1932, 1937. Chenega also alleged that Lt. Col. E. "caused requirements to be included in the RFP that are vaguely stated, incapable of objective measurement, and that serve no purpose other than to enable ACC to provide additional evaluation credits to [Offeror 3]." AR Tab 10, at 1936. In addition, Mr. Vuckovich claimed that during a closed door meeting in February 2009 Lt. Col. E. told him that he needed to give his resume to Mr. S., because Lt. Col. E. knew that Offeror 3 was going to win the Contract. AR Tab 10, at 1936. Accordingly, the alleged gratuity "irreparably tainted" the source selection process that excluded Chenega from the competitive range. AR Tab 10, at 1932.

On September 28, 2009, the Air Force requested that the GAO dismiss Chenega's September 4, 2009 Bid Protest.[16] Pl.'s Mot.

14. FAR 3.104–2 provides: "The offer or acceptance of a bribe or gratuity is prohibited by 18 U.S.C. § 201 and 10 U.S.C. § 2207. The acceptance of a gift, under certain circumstances, is prohibited by 5 U.S.C. § 7353 and 5 C.F.R. § 2635." 48 C.F.R. § 3.104–2.

15. Chenega also attached transcript of on-line conversations and photos posted to Lt. Col. E.'s FaceBook web page documenting Lt. Col. E.'s attendance at Super Bowl XLIII. AR Tab 10, at 1943–45.

16. Attached to the Air Force's request were the sworn declarations of: the CO, Ms. Cooper (Sept. 23, 2009); Lt. Col. E. (Sept. 28, 2009); and Mr. S., (Sept. 27, 2009). AR Tab 10, at 1924–31. Ms. Cooper stated that to her knowledge, Lt. Col. E. "is not and has not been a procurement official with the ACC." AR Tab 10, at 1930. Moreover, Lt. Col. E.'s involvement in the procurement was limited to "providing workload data, duty descriptions, and information relating to the Student and Style Guides." AR Tab 10, at 1930. According to Ms. Cooper, Lt. Col. E. also did not write or approve the Final SOW requirements, and "had no involvement in any areas of the source selection[.]" AR Tab 10, at 1930. In addition, Ms. Cooper noted that, on February 16, 2009, Lt. Col. E. was transferred from Luke AFB to the 606th Air Control Squadron in Spangdahelm, Germany, a month before a draft RFP was issued and two months before the final RFP was published. AR Tab 10, at 1930. Furthermore, Lt. Col. E. had no role in appointing any members to the SSET. AR Tab 10, at 1930. The technical changes complained of by Chenega were made based on a question submitted by DRG, not Offeror 3, and did not involve Lt. Col. E. AR Tab 10, at 1931. Finally, Ms. Cooper stated that Chenega was eliminated from the competitive range, because Chenega's proposal "failed to demonstrate a clear understanding of the solicitation requirements and a substantial rewrite of its proposal would be required for it to even be competitive in the source selection." AR Tab 10, at 1931.

Lt. Col. E.'s September 28, 2009 Declaration was consistent with Ms. Cooper's description of his role in the procurement. AR Tab 10, at 1924–25. Lt. Col. E. and Mr. S., however, acknowledge being friends and admitted that on January 21, 2009, Mr. S. purchased two Super Bowl tickets for Lt. Col. E. AR Tab 10, at 1925,

For Prelim. And Permanent Injunctive Relief ("Pl. Mot. for Inj."), *Chenega Mgmt. LLC. v. United States*, Ex. 5, ECF No. 3 (Fed. Cl. April 12, 2010). On October 8, 2009, Chenega submitted a response to the Air Force's September 28, 2009 request for dismissal challenging the factual accuracy of the declarations of Lt. Col. E., Mr. S., and Ms. Cooper. AR Tab 10, at 1950–56. In addition, Chenega attached the sworn declaration of Mr. Vuckovich, wherein he states that the draft SOW was published well before Lt. Col. E. left the 607 ACS and that Lt. Col. E. was "instrumental in determining" the final contract requirements included in the SOW. AR Tab 10, at 1959. Mr. Vuckovich also confirmed prior statements that Lt. Col. E. suggested changes to the contract requirements. AR Tab 10, at 1959–60. Mr. Vuckovich also stated that he witnessed Mr. S. and Lt. Col. E. purchase Super Bowl tickets together and reported this incident to his Project Manager and the Air Force Office of Special Investigations ("OSI"). AR Tab 10, at 1960. Although Mr. Vuckovich acknowledged attending Arizona Cardinal football games with Lt. Col. E., he claims never to have offered Lt. Col. E. anything of value. AR Tab 10, at 1961. Mr. Vuckovich reiterated that Lt. Col. E. told him to submit his resume to Mr. S., because Lt. Col. E. told him that Offeror 3 was going to win the Contract. AR Tab 10, at 1961.[17] Finally, Chenega attached a July 8, 2009 e-mail from Lt. Col. E. to Mr. Vuckovich that was sent

after Chenega was eliminated from the competitive range, wherein Lt. Col. E. states: "Hope you got your resume to Gator (Mr. S.). Good luck and let me know if you need me to hire you at Spangdahlem." AR Tab 10, at 1962.

### F. The Investigation By The United States Air Force.

On November 10, 2009, the Air Force Legal Operations Agency notified the GAO that the Air Force intended to "take corrective action" in response to Chenega's September 4, 2009 GAO protest. AR Tab 10, at 1915. Specifically, "the agency intend[ed to] investigate the matters alleged in the protest to determine whether improprieties occurred which undermine[d] the integrity of the ... solicitation. Depending upon the outcome of the investigation, the agency [would] take additional corrective action it deem[ed] appropriate." AR Tab 10, at 1915. On the basis of this representation, the Air Force requested that GAO dismiss the protest as "academic or moot." AR Tab 10, at 1915.

As a result of the Air Force's representation, on November 12, 2009, the GAO dismissed Chenega's protest as "academic." AR Tab 15, at 2098; *see also* AR Tab 10, at 1916. Since the issues in Chenega's protest presented "no practical consequences with regard to an existing federal procurement," the GAO determined that a decision would be

1927. Mr. S. and Lt. Col. E. both stated, however, that immediately after Mr. S. purchased the tickets, Lt. Col. E. reimbursed Mr. S., in cash, for the full cost of the tickets, at $800 each, plus a $50 service charge. AR Tab 10, at 1925, 1927. Lt. Col. E. further stated that Mr. Vuckovich was aware of this information. AR Tab 10, at 1925. In addition, Lt. Col. E. was a friend of Mr. Vuckovich and the two previously attended Arizona Cardinals football games together. AR Tab 10, at 1926. Lt. Col. E., however, denied telling Mr. Vuckovich that Offeror 3 was going to win the contract and characterized this statement as a "deliberate lie," but admitted that he told Mr. Vuckovich that he thought it was illegal for CTSC to advise employees that submitting resumes to competitors was a ground for termination. AR Tab 10, at 1925–26. Lt. Col. E. also confirmed that he advised Mr. Vuckovich to provide his resume to every company competing for the Contract, because the winner likely would hire experienced employees from the incumbent contract. AR Tab 10, at 1926. Lt. Col. E. denied telling

Mr. Vuckovich that he was required to submit his resume to Offeror 3. AR Tab 10, at 1926.

17. Chenega also attached a September 30, 2009 Memorandum from Mr. M., a Squadron Operations Specialist at the 726th Air Control Squadron ("726th ACS") with CTSC. AR Tab 10, at 1964–65. Mr. M. reported that, on or around October 28, 2008, he received a phone call from a person who identified himself as Mr. E. of Offeror 3. According to Mr. M., Mr. E. touted that Offeror 3 was uniquely positioned to win the Contract, and therefore he was soliciting resumes from Mr. M. and other operations specialists working for CTSC. AR Tab 10, at 1964. On November 3, 2008, however, Mr. M. stated that Mr. E. called him sounding "tense and abrupt," and told him to hold off sending a resume for the time being. AR Tab 10, at 1964. In March or April of 2009, Lt. Col. G. of the 726th ACS told Mr. M. that Mr. S. contacted him to inquire what duties Mr. M. performed as an operations specialist. AR Tab 10, at 1965.

"in effect, an advisory opinion." AR Tab 15, at 2098; *see also* AR Tab 10, at 1916.

The Air Force's investigation of the allegations in Chenega's September 4, 2009 Bid Protest was conducted by Ms. S., Deputy Director, Contracting, Headquarters, ACC. AR Tab 10, at 1917–19. During the course of her investigation, Ms. S. discovered that there was an existing OSI investigation regarding this procurement on a "matter related to unethical gratuities." AR Tab 10, at 1917. Subsequently, the assigned OSI agent informed Ms. S. that "OSI had been investigating this and other related issues for months," but the "facts did not warrant further investigation from OSI." AR Tab 10, at 1917. Further, "[t]he OSI had not been able to substantiate any of the claims and anticipated no further action." AR Tab 10, at 1917. Ms. S. also reviewed Chenega's allegations and all source selection documents with [redacted], the SSET Chair. AR Tab 10, at 1917. In addition, Ms. S. recorded all answers to questions she posed to the ACC TRSS related to Lt. Col. E.'s involvement in the procurement in an undated and unsigned attachment to her findings. AR Tab 10, at 1917, 1920–21. Ms. S. further relied on the sworn declarations that Lt. Col. E., Mr. S., and the CO (Ms. Cooper) submitted in response to Chenega's September 4, 2009 GAO Bid Protest. AR Tab 10, at 1919. Thereafter, Ms. S. made the following conclusions in a December 3, 2009 Memorandum For The Record ("12/3/09 Air Force Memorandum"):

[Lt. Col. E.'s] involvement in the procurement process was limited to that of a user of the contract services. [Lt. Col. E.'s] involvement in discussing the workload data for academic instructors favored no offeror. He merely identified the level of services that the current contractor, Chenega, was providing.

The Arizona Cardinals became Conference Champions around 18 January 2009 and Super Bowl XLIII was played on 1 February 2009. This is well before the RFP was released and the technical evaluation team members were assigned to the source selection.

[Lt. Col. E.'s] declaration and Mr. S.'s declaration explained that they were fans of the Cardinals and they were season ticket holders. Both declared that the market price was paid for the tickets.

[Lt. Col. E.] did not appoint or evaluate any of the individuals who were involved in the source selection process. He did not participate in the source selection process in any way. It is clear from the facts above, that [Lt. Col. E.] had no way of influencing the outcome of the source selection.

As head of the contracting office, advisor to the source selection team and senior contracting official with over 20 years experience, it is my conclusion that the solicitation and source selection process were not tainted by [Lt. Col. E.'s] conduct or influence.

AR Tab 10, at 1918–19.

### G. The Source Selection Authority's Final Award Decision.

Following Ms. S.'s investigation, the Air Force resumed the source selection process. AR Tab 14, at 2042. On December 21, 2009, the SSET presented a Final PAR to the SSA. AR Tab 9, at 1902–14. On January 14, 2009, the SSA issued a Source Selection Decision ("the Source Selection Decision"), "based on the results of the [SSET's] analysis of the proposals evaluated, ... the supporting briefs, and the recommendations of both the SSET and the [SSAC]." AR Tab 11, at 1968; AR Tab 14, at 2042. The SSA, however, declined to follow the SSET's recommendation to select Offeror 3 for the award, but instead selected DRG. AR Tab 9, at 1899; AR Tab 11, at 1974. According to the Source Selection Decision, the SSA's "best value" determination was that "the higher Mission Capability Technical rating and higher Performance Confidence Assessment rating of [Offeror 3's] proposal do not outweigh the $3.36 million price difference." AR Tab 11, at 1974. With regard to the final evaluations of the offerors' Manning Requirements and Analysis sub-factor, the SSA further explained that the "differences did not give either offeror a clear advantage for this sub-factor which made price that much more important." AR Tab 11, at 1975. Accordingly, the SSA concluded that:

Today's fiscally constrained environment requires hard choices between baseline requirements and additional enhancements that would be nice to have. DRG's proposal meets all mission requirements with little risk of degraded performance. The $3.36 million price difference between the DRG proposal and the higher rated [Offeror 3] proposal is not supported by additional manpower or capability to perform core requirements. While the [Offeror 3] strengths were evaluated as beneficial approaches that exceed minimum stated requirements, they simply are not worth the substantial price difference. . . . I have determined that it is in the best interest of the Government to award the contract for the subject requirement to [DRG]. Their proposal provides the overall best value to the Government.

AR Tab 11, at 1975, 76.

On January 14, 2010, the CO notified DRG of the award of the Contract. AR Tab 12, at 1977–78.

## II. PROCEDURAL HISTORY.

### A. Subsequent Protests Before The Government Accountability Office.

On February 1, 2010, Chenega filed a second bid protest with the GAO, challenging Chenega's elimination from the competitive range, based on allegations of an unlawful gratuity to Lt. Col. E. AR Tab 14, at 2043. In addition, Chenega's protest alleged that the technical evaluation was not reasonable and consistent with the Solicitation's criteria and that price was not evaluated when establishing the competitive range. AR Tab 14, at 2043. On February 4, 2010, the GAO notified the parties that the scope of the protest was limited to "the specific errors identified in connection with the agency's evaluation of the protester's proposal . . . as well as the protester's assertion that the agency failed to

consider price when it established the competitive range and eliminated Chenega from the competition[.]" AR Tab 14, at 2043; Pl. First Mot. To Supp. Ex. 3, ECF No. 16–3. The GAO also advised that it had decided to "not further develop the protester's allegations of bias and related arguments regarding unequal treatment." AR Tab 14, at 2043; Pl. First Mot. To Supp. Ex. 3, ECF No. 16–3.

On March 5, 2010, Chenega also filed a related protest in the GAO, challenging the award to DRG. AR Tab 14, at 2043. On or about March 19, 2010,[18] the Air Force filed an "Air Force Memorandum of Law" to comply with the requirements of 31 U.S.C. § 3553(b)(2),[19] and request that the protest be denied. AR Tab 14, at 2036–97. On March 29, 2010, Chenega filed a Response. On April 13, 2010, the GAO dismissed both of Chenega's pending protests, because on April 12, 2010 Chenega filed a Complaint in the United States Court of Federal Claims. AR Tab 15, at 2099.

### B. Before The United States Court Of Federal Claims.

On April 12, 2010, Chenega ("Plaintiff") filed a Complaint under seal in the United States Court of Federal Claims, challenging the January 14, 2010 award of the Contract to DRG, together with a Motion For Preliminary Injunction and Motion For Permanent Injunction.

On April 14, 2010, the court convened a status conference to discuss Plaintiff's Motion for Preliminary Injunction, the content of the Administrative Record, as well as the nature and schedule of further proceedings. *See* RCFC Appendix C ¶ 8. On April 15, 2010, the court entered an order deferring Plaintiff's Motion For Preliminary Injunction, in light of the Government's representation that the Air Force voluntarily would stay contract performance until July 31, 2010.[20]

---

18. This "Memorandum of Law" is not dated, but attached to it was a "Contracting Officer's Statement of Facts," dated March 19, 2010. AR Tab 14, at 2097.

19. 31 U.S.C. § 3553(b)(2) provides that "a Federal agency receiving a notice of a protested procurement [at the GAO] shall submit to the Comptroller General a complete report (includ-

ing all relevant documents) on the protested procurement[.]" 31 U.S.C. § 3553(b)(2).

20. At the July 19, 2010 oral argument, counsel for the Government indicated that the Air Force would continue to stay contract performance pending resolution of this protest. 1/19/10 TR 58–59.

On that same date, the court also entered an Order establishing a schedule for filing Cross–Motions For Judgment On The Administrative Record and directed the Government to file the Administrative Record by April 23, 2010. On April 23, 2010, the Government filed the Administrative Record. On May 12, 2010, Plaintiff filed two Motions To Supplement The Administrative Record.

On May 14, 2010, pursuant to a telephone conference with the parties on that same date, the court entered an Order deferring ruling on Plaintiff's Motions To Supplement "pending the court's determination of whether the existing record is insufficient to permit meaningful review" of the allegations of this protest, pursuant to *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed. Cir.2009). Order, *Chenega Mgmt., LLC v. United States,* 10–221, ECF No. 18 (May 14, 2010).

On May 21, 2010, Plaintiff filed a Motion For Judgment On The Administrative Record ("Pl. Mot."). On June 18, 2010, the Government filed a Response and Cross Motion For Judgment On The Administrative Record ("Gov't Mot."). On June 28, 2010, Plaintiff filed a Reply and Response ("Pl. Resp."). On July 2, 2010, the Government filed a Response and Reply ("Gov't Reply").

## III. JURISDICTION.

### A. Jurisdiction.

■ The United States Court of Federal Claims is required to make a threshold determination regarding jurisdiction. *See Fisher v. United States,* 402 F.3d 1167, 1173 (Fed.Cir.2005) ("At the outset [the court] shall determine ... whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-man-

dating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course.").

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

■ In this case, the April 12, 2010 Complaint alleged several violations of law and/or regulation "in connection with" this procurement. *Id.* Specifically, Counts I, II, and III allege that the Air Force arbitrarily and unlawfully awarded the contract to DRG, in an effort to avoid confronting Plaintiff's allegations regarding the unlawful gratuity paid to Lt. Col. E. Compl. ¶¶ 75–79, 84–90, 94–98. In doing so, the Air Force "shifted its favoritism" from Offeror 3 to DRG and deviated from the stated evaluation criteria by converting the source selection methodology from "best value" to "lowest cost, technically acceptable," in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2305(b)(1),[21] 41 U.S.C. § 253b(d)(3),[22] and FAR 15.303(b)(4).[23] Compl. ¶¶ 75–79, 84–90, 94–98. In addition, Count II alleges that the Air Force's decision to eliminate Chenega from the competitive range violated FAR 1.602–2. Compl. ¶¶ 80–83. Count III also alleges that the Air Force's competitive range determination was the product of unlawful bias in favor of Offeror 3 and against Chenega. Compl. ¶¶ 91–94. Count IV further alleges that the Air Force's refusal to take

---

**21.** 10 U.S.C. § 2305(b)(1) provides: "The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1).

**22.** 41 U.S.C. § 253b(d)(3) provides: "the executive agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United

States, considering only cost or price and the other factors included in the solicitation." 41 U.S.C. § 253b(d)(3).

**23.** Although not specifically cited in the April 12, 2010 Complaint, Plaintiff refers to these statutes and regulations in Plaintiff's May 21, 2010 Motion For Judgment On The Administrative Record. Pl. Mot. at 44–45.

corrective action to remedy the alleged gratuity, after representing to the GAO that it would take affirmative corrective action was "arbitrary and capricious" and taints the "integrity" of the source selection. Compl. ¶¶ 99–107. Count V also alleges that the January 14, 2010 Final Award Decision was arbitrary, because the source selection process was tainted by the alleged gratuity and unlawful bias in violation of 10 U.S.C. § 2207, 18 U.S.C. § 201, and FAR 3.101–2. Compl. ¶¶ 108–12. Finally, Count VI alleges that, if Chenega's elimination from the competitive range was not the product of intentional misconduct, it must have been the result of the Air Force arbitrarily and capriciously selecting unqualified proposal evaluators. Compl. ¶¶ 113–120. Accordingly, the April 12, 2010 Complaint recites a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

## B. Standing.

 As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs. v. United States,* 275 F.3d 1366, 1369–70 (Fed.Cir.2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party," as defined by the CICA, 31 U.S.C. § 3551(2)(A) (2006). *See Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protestor is an "interested party:" (1) the protestor must show that it was an actual or prospective bidder or offeror; and (2) the protestor must have a direct economic interest in the procurement or proposed procurement. *See Distrib. Solutions, Inc. v. United States,* 539 F.3d 1340, 1344 (Fed.Cir.2008) ("To qualify as an 'interested party,' a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct

economic interest in the procurement or proposed procurement.") (citations omitted).

 In addition to establishing "interested party" status, a protestor must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States* ("*Labatt*"), 577 F.3d 1375, 1378–79 (Fed.Cir.2009) ("It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'"); *see also Myers,* 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt,* 577 F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

 In this case, the Plaintiff submitted a proposal in response to the Solicitation. AR Tab 4, at 590–939. As an actual bidder, Plaintiff satisfies the first part of the "interested party" test. *See Distrib. Solutions, Inc.,* 539 F.3d at 1344. Whether Plaintiff had a "direct economic interest" and was prejudiced by the Air Force's alleged errors, however, is impacted by the fact that Plaintiff was not among the two offerors selected for inclusion in the competitive range. AR Tab 3, at 481; *see also United States v. Int'l Bus. Machs. Corp.,* 892 F.2d 1006, 1010–12 (Fed.Cir.1989) (holding that a bidder rated below second, did not have the required direct economic interest in the contract award to qualify as an interested party under the Brooks Act). In the context of a post-award bid protest, however, an offeror eliminated from the competitive range is not necessarily precluded from establishing standing as an interested party. *See Impresa Construzioni Geom. Domenico Garufi v. United Sates,* 238 F.3d 1324, 1334 (Fed.Cir.2001) (holding that a protestor eliminated from the competitive range had standing in post-award bid pro-

test); *see also USfalcon, Inc. v. United States*, 92 Fed.Cl. 436, 452 (2010) (same). Under these circumstances, the court must determine whether, if the protest is successful, the Government would be obliged to re-solicit the contract, for which the protestor could again compete. *See Impresa*, 238 F.3d at 1334 (holding that if the protest were successful because of an arbitrary and capricious responsibility determination, "the government would be obliged to rebid the contract, and appellant could compete for the contract once again."). If the answer to this inquiry is yes, then the protestor has a "substantial chance of receiving the award and an economic interest and has standing to challenge the award." *Id.*; *see also Esterhill Boat Serv. Corp. v. United States*, 91 Fed.Cl. 483, 486 (2010) ("a disappointed bidder is not necessarily stripped of his standing to protest because he is eliminated from the competitive range. The court must consider why the bidder was eliminated").

■ In this case, Plaintiff challenged the evaluation process that resulted in its exclusion from the competitive range, as well as the ultimate award to DRG. Compl. ¶¶ 75–120. Specifically, Counts II–V of the April 12, 2010 Complaint contain allegations of bias, illegal gratuities, and unequal treatment, any of which, if established, would render Chenega's elimination from the competitive range arbitrary and capricious. Compl. ¶¶ 80–120; *see also Brown Const. Trades, Inc. v. United States*, 23 Cl.Ct. 214, 215 (1991) ("The case law uniformly states that public policy considerations, in particular concern for the integrity of the Govern-

ment procurement process, preclude the enforcement of contracts tainted by bribery, kickbacks or conflicts of interest."); *see also Hamilton Sundstrand Power Sys. v. United States*, 75 Fed.Cl. 512, 516 (2007) (holding that unequal treatment in a competitive range determination, would be a "quintessential example [ ] of conduct which lacks a rational basis"). Consequently these allegations, if established, necessarily would require the Air Force to re-solicit the Contract, and afford Plaintiff the opportunity to compete again. *See CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1575 (Fed.Cir.1983) (requiring the Government to re-solicit a contract tainted by illegality). As to these Counts, Plaintiff has established that it had a substantial chance of being awarded the Contract,[24] but for the alleged errors, and, therefore, had a direct economic interest in the procurement. *See* 28 U.S.C. § 1491(b)(1); *see also Myers*, 275 F.3d at 1370 ("Standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract. Thus, the substantial chance rule continues to apply.") (internal quotations omitted).

■ Count I, on the other hand, alleges that the SSA did not follow the source selection criteria in awarding the Contract to DRG. Compl. ¶¶ 75–99. Plaintiff, however, does not have standing as an "interested party" to challenge the award on the grounds alleged in Count I of the April 12, 2010 Complaint, unless Plaintiff prevails on Counts II–V.[25]

---

**24.** The court's prejudice determination, however, is limited to standing. *See Allied Tech. Group, Inc. v. United States*, 94 Fed.Cl. 16, 37 (2010) ("Our [c]ourt has held that the prejudice requirement for standing is less stringent than that required for success on the merits. The prejudice requirement for standing is satisfied by a nominal showing that a protestor could compete for the contract.") (internal quotations omitted). In a post-award bid protest, the court is required to confront the issue of prejudice twice: "first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief." *A & D Fire Prot. Inc. v. United States*, 72 Fed.Cl. 126, 131 n. 4 (2006). The United States Court of Federal Claims recently has observed that the prejudice inquiry for purposes of stand-

ing is akin to a threshold showing of a "viable allegation of agency wrong doing with viability here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *Electronic Data Sys., LLC v. United States*, 93 Fed.Cl. 416, 429–430, n. 13 (2010) (internal quotations omitted); *see also Magnum Opus Technologies, Inc. v. United States*, 94 Fed.Cl. 512, 530, n. 12 (2010) (observing the confusion surrounding the fact that prejudice is examined at two stages in a bid protest, *i.e.*, the "limited review" for standing is jurisdictional and whether injunctive relief is warranted on the merits).

**25.** In Plaintiff's Response and Reply, Plaintiff contends for the first time that the Air Force's

Accordingly, the court's Memorandum Opinion and Order is limited to adjudicating the merits of Courts II, III, IV, V and VI of the April 12, 2010 Complaint.

## IV. APPLICABLE STANDARD OF REVIEW.

 Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed.Cir.2009) (same).

 When a bid protest is based on a regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable

statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381 (internal quotations and citations omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med, Assoc. Inc.*, 369 F.3d 1324, 1330 (Fed.Cir.2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion ... the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp. v. Widnall*, 98 F.3d 1325, 1327 (Fed.Cir.1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

 If an award decision is challenged, because it was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, so that the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed.Cir.2009); *see also Savantage Fin. Servs. Inc. v. United States*, 595 F.3d 1282, 1287 (Fed.Cir.2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke [ ] highly deferential rational basis review ... [u]nder that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted).

decision to hold discussions was insufficiently documented and violated FAR 15.306(b)(2). Pl. Resp. & Reply at 28–29, 32. Plaintiff did not raise this claim in either the April 12, 2010 Complaint or the May 21, 2010 Motion For Judgment On The Administrative Record. Accordingly, this claim is waived. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir.2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief-they do not provide the moving party with a new oppor-

tunity to present yet another issue for the court's consideration.") (emphasis in the original); *see also DMS All–Star Joint Venture v. United States*, 90 Fed.Cl. 653, 668 (2010) (observing that "[a]rguments raised for the first time in a reply brief are not properly before the court"). Even if the court were to consider this argument, Plaintiff, as a competitor excluded from the competitive range, has failed to demonstrate how it was prejudiced by this decision. *See Int'l Bus. Machs. Corp.*, 892 F.2d at 1010–12.

■ In the alternative, if an award decision is challenged on the grounds that an agency has acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus. Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed.Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also John C. Grimberg Co.*, 702 F.2d at 1372 (holding that the court may set aside agency action "only in extremely limited circumstances")).

■ In this case, the parties have filed Cross–Motions For Judgment On The Administrative Record, pursuant to RCFC 52.1, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, although the court has not conducted an evidentiary proceeding. *Id.* at 1357 (instructing the court to make "factual findings under RCFC [52.1] [26] from the [limited] record evidence as if it were conducting a trial on the record").

## V. SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD.

■ Congress requires that, the United States Court of Federal Claims review an "agency's decision pursuant to the standards set forth in Section 706 of [the APA.]" 28 U.S.C. § 1491(b)(4). In applying the APA standard the United States Supreme Court has held that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision *based on the record the agency presents to the reviewing court.*") (emphasis added). Consequently, the United States Court of Appeals for the Federal Circuit has held that "the parties' ability to supplement the administrative record is limited [,]" with review restricted "to the record actually before the agency[.]" *Axiom Res. Mgmt.*, 564 F.3d at 1379–80. Supplementation is appropriate "only if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381. Accordingly, the court should grant a motion to supplement only when failure to do so would "frustrate effective judicial review." *Id.* (quoting *Camp*, 411 U.S. at 142–43, 93 S.Ct. 1241).

■ Plaintiff filed two Motions To Supplement The Administrative Record. In the first, Plaintiff moves to supplement with three exhibits: the February 1, 2010 GAO Bid Protest ("Pl. Ex. 1"); the March 29, 2010 Response To The Air Force's Agency Report ("Pl. Ex. 2"); and a February 4, 2010 Facsimile Transmission Sheet from GAO to the parties ("Pl. Ex. 3"). *See* May 12, 2010 Pl. First Mot. To Supp. ECF. No. 16. Although Exhibits 1 and 2 help explain the procedural posture of this case, they contain nothing more than Chenega's arguments before the GAO. Exhibit 3, however, is relevant to Plaintiff's claim that the Air Force improperly awarded the Contract to DRG in an effort to deflect inquiry into Chenega's bias allegations. Plaintiff argues that the Air Force award decision was motivated by the GAO's

---

**26.** In 2006, RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1, to conform to the United States Court of Appeals for the Federal Circuit's holding in *Bannum*. *See* RCFC 52.1, 2006 Rules Committed Notes.

determination that a *prima facie* case for bias had been established, a fact the Government disputes. *Compare* Pl. Mot. at 9, 36, 42 53 *with* Gov't Mot. at 11 n. 9; Gov't Resp. at 3–4. Exhibit 3 is the GAO determination concerning the bias allegations that Chenega insists motivated the Air Force's award decision-making process. Pl. Mot. at 9, 36, 42 53. To perform an "effective" APA review, "the court must have a record containing the information upon which the agency relied when it made its decision *as well as any documentation revealing the agency's decision-making process.*" *Pitney Bowes Gov't Solutions, Inc. v. United States,* 93 Fed.Cl. 327, 332 (2010) (emphasis added). Therefore, without Exhibit 3, the court would be unable to determine whether a factual basis exists for Plaintiff's bias allegations. *See Axiom Res. Mgmt.,* 564 F.3d at 1381. Accordingly, Plaintiff's May 12, 2010 First Motion To Supplement The Administrative Record is denied with respect to Exhibits 1 and 2, but granted in part with respect to Exhibit 3.

▮▮▮▮ Plaintiff's May 12, 2010 Second Motion To Supplement ("Pl. Sec. Mot. to Supp.") seeks to include a copy of an e-mail exchange among Air Force officials and a CTSC employee regarding his request to work remotely. Plaintiff contends that these documents should be added to the Administrative Record, because they "provide [ ] further evidence of unlawful bias against Chenega[.]" *Id.* at 1. The court has recognized that allegations of bias or bad faith present a unique challenge in bid protest cases, because evidence of bias or bad faith will rarely be included in the administrative record. *See Beta Analytics Int'l, Inc. v. United States,* 61 Fed.Cl. 223, 226 (2004) ("[R]are indeed would be the occasions when evidence of bad faith will be placed in the administrative record, and to insist on this—and thus restrict discovery regarding bad faith to cases involving officials who are both sinister and stupid—makes little sense."); *see also Pitney Bowes Gov't Solutions, Inc.,* 93 Fed. Cl. at 332 ("Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation."). Mere allegations of bias, however, are not sufficient to justify supplementation. *See Beta Analytics Int'l, Inc.,* 61

Fed.Cl. at 226 ("Innuendo or suspicion is not enough to demonstrate bad faith and thus justify discovery."). Instead, a party seeking to supplement the Administrative Record, must make a "strong showing of bad faith or improper behavior[.]" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Accordingly, the United States Court of Federal Claims has held that such allegations must be based on hard facts and are sufficiently well grounded to warrant supplementation. *See Pitney Bowes,* 93 Fed. Cl. at 332. ("The strong showing must have an evidentiary foundation and not rest merely on counsel's argument, suspicion, or conjecture. Allegations of bad faith and bias [must be] sufficiently well grounded to warrant supplementation of the Administrative Record, and based upon hard facts.") (internal quotations omitted). Although the burden of proof for supplementing the record is less than establishing bad faith or bias on the merits, the protestor must at least "assert a reasonable factual predicate for such allegation." *Id.* Accordingly, a party seeking to supplement the administrative record, "based upon allegations of bad faith, must: (1) make a threshold showing of either a motivation for the [G]overnment employee to have acted in bad faith or of conduct that is hard to explain absent bad faith; and (2) persuade the court that discovery could lead to evidence that would provide the level of proof sufficient to overcome the presumption of regularity and good faith." *Id.* As discussed herein, Plaintiff failed to make the "strong showing" of bias necessary to warrant supplementation. *See Overton Park, Inc.,* 401 U.S. at 420, 91 S.Ct. 814.

Plaintiff also seeks to supplement with SSET e-mails criticizing the performance of the incumbent contractor, CTSC, the employees of which Plaintiff intended to hire. Pl. Sec. Mot. to Supp. at 1. Even if the court admitted these e-mails, this criticism alone does not give rise to a motivation for bias, nor does it evidence conduct that is difficult to explain absent bias. *See Four Points by Sheraton v. United States,* 63 Fed.Cl. 341,

344–45 (2005) (holding that the Government's "[c]riticism of Plaintiff's performance on the incumbent contract in areas required to be evaluated or erroneous evaluations or inconsistent scoring do not rise to the level of motivation for bias.... Nor was there alleged conduct by these individuals which was difficult to explain, absent bias."). Moreover, in this case, Plaintiff's counsel conceded at oral argument that e-mails at issue were unlikely to lead to evidence that would "provide the level of proof sufficient to overcome the presumption of regularity and good faith." 7/19/10 TR at 34.

For these reasons, the court has determined that Plaintiff's Second Motion To Supplement The Administrative Record should be denied. Pl. Sec. Mot. to Supp., *Chenega Mgmt. LLC*, 10–221, ECF No. 16, 17 (Fed.Cl. May 12, 2010).

## VI. DISCUSSION.

### A. Plaintiff's Motion For Judgment On The Administrative Record.

Plaintiff's May 21, 2010 Motion for Judgment on the Administrative Record first argues that Lt. Col. E. participated "personally and substantially" in the drafting the Solicitation, as defined in FAR § 3.104–1.[27] Pl. Mot. at 42. Lt. Col. E. also is alleged to have "solicited and accepted" Super Bowl tickets with a "street value of $6,000 to $7,000 as a gratuity from Mr. S., Offeror 3's President and CEO, *"while ...* [Offeror 3] competed for the [Air Force's] contract." Pl. Mot. at 39, 41–42 (emphasis added). In soliciting and receiving this gratuity, Lt. Col. E. violated 10 U.S.C. § 2207, 18 U.S.C. § 201, and FAR §§ 3.101–2, 3.104–2(b)(1). Since

these violations of law tainted the integrity of the procurement process, Plaintiff is not required to establish prejudice. Pl. Mot. at 39–41. Instead, this case is analogous to one concerning conflict of interest, where "the high hurdle of prejudice is removed from the path of the plaintiff." *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 65 (1989). The initial November 12, 2009 GAO decision supports the conclusion that Lt. Col. E.'s acceptance of the Super Bowl tickets "created the appearance of impropriety" and, for this reason, the Air Force initially recommended that corrective action be taken. *Id.* Thereafter, not only did the Air Force not take corrective action, as represented to the GAO, but then changed the source selection evaluation method to avoid further inquiry into the unlawful gratuity. *Id.*

Next, Plaintiff argues that the Air Force was biased and engaged in unequal treatment at several critical stages of this procurement. Pl. Mot. at 43–44. As for Plaintiff's elimination from the competitive range, the Air Force's bias and unequal treatment are "clear" by virtue of the 56 "unjustified" deficiencies, substantial weaknesses, weaknesses, and uncertainties assigned to Chenega's proposal. Pl. Mot. at 44. In the "Statement of Facts," Plaintiff responds that each of the [redacted]. *Id.* at 11–34. The Air Force did not explain how the deficiencies identified in the Initial PAR made Plaintiff's successful performance of the contract less likely. *Id.* at 46. Instead, the deficiencies, many of which were "typographical errors," were referenced several times to "increase their negative impact on [Plaintiff's] chances to win," and then the Air Force erroneously

---

27. FAR § 3.104–1 states: "Participating personally and substantially in a Federal agency procurement" means—
 (1) Active and significant involvement of an official in any of the following activities directly related to that procurement:
 (i) Drafting, reviewing, or approving the specification or statement of work for the procurement.
 (ii) Preparing or developing the solicitation.
 \* \* \*
 (2) "Participating personally" means participating directly[.]
 (3) "Participating substantially" means that the official's involvement is of significance to

the matter. Substantial participation requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. Participation may be substantial even though it is not determinative of the outcome of a particular matter. A finding of substantiality should be based not only on the effort devoted to a matter, but on the importance of the effort. While a series of peripheral involvements may be insubstantial, the single act of approving or participating in a critical step may be substantial[.]

48 C.F.R. § 3.104–2(b).

identified these weaknesses as an independent deficiency. *Id.* The two offerors not eliminated from the competitive range, DRG and Offeror 3, were not subjected to the same "harsh treatment." Pl. Mot. at 46.

In addition, the Air Force "later acted to cover up the unequal treatment" by awarding the Contract to DRG to avoid scrutiny of the illegal gratuity. Pl. Mot. at 43. Since the unequal treatment of proposals violates 48 C.F.R. § 1.602–2, the Air Force's nonfeasance was unlawful and the subsequent cover up was "arbitrary, capricious and irrational." *Id.* at 44, 50.[28] As a matter of law, however, the issuance of a solicitation "gives rise to an implied contract of fair dealing." *Hunt Bldg. Co. v. United States,* 61 Fed.Cl. 243, 273 (2004). An implied contract requires that the contracting agency evaluate all proposals equally and impartially. *Id.* Equal treatment has been interpreted to mean "evaluating proposals evenhandedly against common requirements and evaluation criteria." *Hamilton Sundstrand Power Sys.,* 75 Fed.Cl. at 516.

According to Plaintiff, the GAO ruled that Chenega established *a prima facie* case that Lt. Col. E. accepted an illegal gratuity. *Id.* at 53. To avoid the consequences of that protest, the Air Force agreed to take corrective action. *Id.* No corrective action, however, was taken. *Id.* at 53. Moreover, the Air Force investigation was flawed. *Id.*

The Air Force "had no reason to accept" the claims of a cash payment in the sworn declarations of Mr. S. and Lt. Col. E., but did so to "avoid having to confront the fact of the illegal gratuity," and accepted the claims to avoid taking corrective action. *Id.* Little or no probative weight should be given to the sworn declarations of Mr. S. and Lt. Col. E., because of their interest in this case. *Id.* In fact, the inconsistencies in the sworn declarations contradict the Air Force's finding that no impropriety occurred. *Id.* For example, according to Mr. S.'s Declaration, Lt. Col. E. paid cash for the tickets, but Lt. Col. E.'s

Declaration omits this information, suggesting that Mr. S.'s Declaration was untruthful and that the tickets were a gratuity. *Id.* at 53–54. Although Mr. S. claims that Lt. Col. E. paid $1,650 in cash for the tickets, cash transactions in this amount are unusual, and Mr. S. is aware that this transaction is incapable of verification. *Id.* at 54. Indeed, no bank records were proffered to corroborate that Lt. Col. E. withdrew this amount to pay Mr. S. *Id.* at 54. Lt. Col. E.'s Declaration states that he was not aware that the transaction could be construed as improper, but if this were true he would not have paid Mr. S. in cash, and "between friends" Mr. S. "surely" would have trusted Lt. Col. E. "to write ... a good check." *Id.* Moreover, "[i]t defies credibility" that Lt. Col. E. did not realize that he could not "accept things of value from a contractor competing for a contract for which he has a personal and substantial involvement." *Id.* Under these circumstances, the Air Force's refusal to take corrective action "increases the taint on the integrity" of the source selection process. *Id.* at 54.

Plaintiff further argues that the allegedly unjustified "weaknesses, uncertainties, and deficiencies, *possibly* are a consequence of the [Air Force's] employment of unqualified individuals to evaluate offerors' technical workload data in their proposals." *Id.* at 55 (emphasis added). According to Plaintiff, "[t]he [Air Force's] SSET members cannot fairly assess offerors' proposals when they lack the subject matter expertise necessary to enable them to do so." *Id.* As evidence that the SSET members "lack[ed necessary] subject matter expertise," at Plaintiff's debriefing one of Plaintiff's representatives asked "who the [Air Force] utilized to evaluate proposal[s] that possessed Workload Factor analysis experience," and the Air Force responded "that the AF could access 'subject matter' expertise, if absolutely necessary, but that it did not do so." *Id.* Plaintiff also points to the "substance of the deficiencies and weaknesses applied to [Plaintiff]'s proposal," that showed the proposal either was

---

**28.** Plaintiff also claims that in selecting DRG for award, the Air Force violated the CICA, 10 U.S.C. § 2305(b)(1), 41 U.S.C. § 253b(d)(3) and FAR 15.303(b)(4), by deviating from the evaluation criteria in abandoning a "best value" determination in favor of a "lowest price technically acceptable" method. Pl. Mot. at 44, 50–51. The court, however, has determined that Plaintiff has no standing to bring this claim.

"intentionally downgraded ... without cause" or the evaluators lacked expertise. *Id.* Under either scenario, the *evaluations* lack a rational basis, and "as a consequence [Plaintiff] was unlawfully prejudiced." *Id.*

## B. The Government's Cross–Motion And Response.

The Government rejects the argument that the Air Force "arbitrarily failed to take corrective action," because it "undertook a searching inquiry, presided over by one of ACC's highest-ranking contracting officials ... informed by, among other things, the materials Chenega filed during its first protest and the sworn statements of [Lt. Col. E.], [the SSET Chair], [Mr. S.] and Ms. Cooper." Gov't Mot. at 22 (citing AR Tab 10). The fact that OSI was unable to substantiate the bribery allegations indicates that Lt. Col. E. did not behave improperly. *Id.* at 23. Accordingly, the Air Force took the appropriate corrective action.

Likewise, Plaintiff's bias allegations are "unfounded." *Id.* at 24. Since the claim of bias is "essential" to Counts II and III of the April 12, 2010 Complaint, Plaintiff cannot succeed on either Count without establishing that the 12/3/09 Air Force Memorandum was "irrational." *Id.* at 24. Moreover, bias claims are analyzed as a type of bad-faith claim and the protestor bears the burden to overcome the presumption of good faith and administrative regularity that attends an agency's decision. *Id.* at 25. Accordingly, a protestor's allegations of bad faith must be established by "almost irrefragable" proof.

The Government also rejects Plaintiff's contention that this case is analogous to a conflict of interest case, where a showing of prejudice is not required. *Id.* at 26–27. In every case where an injunction is issued, there must be "a meaningful connection between an employee's actual statutory or regulatory violation and some improper influence on the procurement." *Id.* at 27. Otherwise "a protest would be sustained whenever a protestor can prove that any one of the agency's thousands of employees violated a conflict-of-interest statute[.]" *Id.* In this case, Plaintiff "does not contend ... that [Lt. Col. E.] evaluated proposals, con-

trolled the source-selection process, or conspired with the entire source-selection team to exclude Chenega from the competition." *Id.* Instead, Plaintiff contends that Lt. Col. E. "participated personally and substantially" in the Draft SOW, but mischaracterizes his involvement. The Air Force "determined that [Lt. Col. E.'s] only role in the procurement was to provide factual data to the team drafting the SOW regarding 'workload estimates for contract instructors' and to review certain 'proposed SOW wording regarding instructor's duties,' input that 'favored no offeror.'" AR Tab 10, at 1917, 1919. As the DO for the 607 ACS, Lt. Col. E. was the logical choice to provide such requirements data to the SSET. *Id.* (citing AR Tab 10, at 1922–23) ("[T]he obvious factual fault in [Plaintiff]'s argument" is that the alleged contribution to the Draft SOW was "only a desired qualification possessed by numerous individuals."). In any event, Lt. Col. E.'s contribution concerned only a small portion of the SOW, *i.e.,* approximately 14% of the Contract's cost. *Id.* Accordingly, the Air Force properly concluded that "[Lt. Col. E.'s] role was de minimus and favored no offeror." *Id.* at 28–29 (citing AR Tab 10, at 1922, 1924).

The timing of the alleged events further supports the Air Force's decision. Gov't Mot. at 30. Lt. Col. E.'s input to the draft SOW took place "in late November and early December 2008, ... when not even the most knowledgeable football fan could say with certainty whether the Arizona Cardinals would reach the ... Super Bowl." *Id.* The Solicitation, however, was not issued until "months later," after Lt. Col. E. transferred to Spangdalem Air Base in Germany. *Id.* at 30. Consequently, the initial evaluation and the competitive range determination were not related to his contribution. *Id.* at 30–31. Moreover, the "unchallenged evidence shows" that at the time of his contribution, Lt. Col. E. did not even know that Offeror 3 would submit a proposal. *Id.* at 31.

Assuming *arguendo* that Lt. Col. E. did add a "requirement" to the Draft SOW, as alleged by Plaintiff, *"it would have benefited Chenega,* not [Offeror 3]." *Id.* at 29 (emphasis in original). The "requirement" allegedly

contributed by Lt. Col. E. was "the desired qualification that Training Instructors be graduates of the Advanced Weapon Director Course." *Id.* at 28 (emphasis omitted). The fatal error in Plaintiff's argument is that it focused on "the only non-government person assigned to the 607 ACS who has taken the Advanced Weapon Director Course and graduated from it"—Mr. Vuckovich. *Id.* at 29; AR Tab 10, at 1959. As a result, "this alleged requirement . . . would have favored Chenega." *Id.* at 29.

Therefore, contrary to Plaintiff's claims, the Air Force expressly determined that Lt. Col. E. "*did not* receive a gift in exchange for any favorable treatment." *Id.* at 30 (citing AR Tab 10, at 1918–19). Although Plaintiff argues that the occurrence of an illegal gratuity was "obvious and inescapable," obviousness is not at issue. *Id.* The Administrative Record "contains un-rebutted evidence that [Lt. Col. E.] paid face value . . . for the two tickets." *Id.* at 31. Both Lt. Col. E. and Mr. S. admitted to their friendship and shared interest in football, but denied that the tickets were a gratuity. *Id.* Plaintiff proffers no evidence that Lt. Col. E. did not pay face value for the tickets. *Id.* Instead, Plaintiff only makes insinuations from the fact that Lt. Col. E. paid cash for the tickets and has no bank records of the transaction. *Id.* These inferences are insufficient to show that the Air Force's decision was not "rational," and "in any case, these inferences fall far short of the 'hard facts' necessary to establish that the Air Force, or one of its officers, acted in bad faith." *Id.* at 31.

Turning to Plaintiff's argument that all offerors were not treated equally in the initial evaluation and competitive range determination, the Government emphasizes that "equal treatment does not mean equal ratings for unequal proposals." *Id.* at 32. Moreover, "judicial deference to agency action is at its zenith when a protestor . . . challenges an agency's technical evaluation in a negotiated, best-value procurement." *Id.* at 32. The Government then provides a detailed rebuttal of the 42 individual ratings contested by Plaintiff. *Id.* at 33–70.

As for Plaintiff's argument that the SSET members were "possibly" unqualified, the Government responded that "[t]he Air Force's technical team was a highly qualified mix of seven civilians and military officers with significant subject-matter and contracting experience." Gov't Mot. at 70. Consequently, the court should not disturb an agency's choice of evaluators absent evidence of "bad faith, bias, or a conflict of interest." *Id.* at 70–71. Tellingly, Plaintiff does not even allege bad faith, bias, or conflict of interest, but instead, proffers only a comment allegedly made by an unidentified Air Force official during the post-award debriefing. *Id.* at 71. This uncorroborated statement is not in the Administrative Record but, even if made, would be insufficient to overcome the deference given to agency discretion. *Id.* at 71.

## C. Plaintiff's Response And Reply.

Plaintiff's June 28, 2010 Response and Reply makes six points. First, Plaintiff contends that the GAO recommended the Air Force take corrective action and the Air Force promised to do so only to obtain a dismissal. Pl. Resp. and Reply at 4 (citing AR Tab 10, at 1917). The Air Force's subsequent investigation, however, took no further steps other than to re-package information. *Id.* For example, Ms. S.'s "consultation" with OSI took place well before the GAO recommended corrective action, not as part of a new independent investigation. *Id.* Ms. S. does not identify with whom she consulted at OSI, nor does she disclose when the investigation occurred, its scope, or results. *Id.* In addition, Ms. S. never contacted Mr. Vuckovich or any other person who could possibly have incriminating information about the illegal gratuity. *Id.* Accordingly, Ms. S.'s effort "hardly qualifies as an investigation[,]" as it relied on hearsay and therefore is of no evidentiary value. *Id.* at 5. Therefore, Air Force so-called corrective action is not entitled to any deference, because the GAO already considered and rejected the information relied upon in Ms. S.'s written findings. *Id.* at 6.

Second, the "irrefragable proof" standard "does not apply when the claims asserted involve the payment of a gratuity or bribe in violation of a federal criminal statute enacted

to protect the integrity of the government's procurement processes." *Id.* at 5.

Third, the Air Force arbitrarily concluded that Lt. Col. E.'s conduct did not taint the procurement. *Id.* at 7. Despite assertions about the extent of Lt. Col. E.'s involvement in the procurement, FAR 3.104 makes no distinction between "major" and "minor" roles in the procurement when an illegal gratuity is involved. *Id.* Although Lt. Col. E. was not directly involved in the source selection, he had regular contact with and substantial influence over Captain S. and MSgt. O., both of whom sat on the SSET and directly reported to Lt. Col. E. *Id.* at 7–8. In addition, Lt. Col. E. had frequent contact with Lt. Col. H. and MSgt. H. Accordingly, a "simple statement" from Lt. Col. E. about the incumbent contractor could have influenced the source selection against Chenega. *Id.* at 8. In addition, Lt. Col. E. participated personally and substantially in the procurement through January 26, 2009 and received the Super Bowl tickets on January 21, 2009, while he was still the DO of the 607 ACS. *Id.* at 9.[29]

Fourth, Plaintiff also contends that, as a result of this taint, the Air Force amended the RFP on April 30, 2009, without explanation, to allow consideration of subcontractors' past performance when assessing an offeror's past performance. *Id.* Offeror 3, however, had no relevant past performance, so the best rating it could have achieved without consideration of its subcontractor was a neutral rating. *Id.* Past Performance, however, became the most important factor in the source selection, so this change significantly improved Offeror 3's chances of receiving award. *Id.*

Fifth, Plaintiff answers each of the Government's arguments regarding the rationality and fairness of [redacted]. *Id.* at 10–48. Therefore, when viewed in their entirety, it is evident that the Air Force violated FAR 15.306(b)(2), mandating that offerors be treated equally. *Id.* at 17, 20, 21, 27, 32, 49. In addition, the Air Force violated 10 U.S.C.

§ 2305(b)(4)(A)(ii) and FAR 52.215–1 by failing to properly document the rationale for holding these discussions. *Id.* at 28, 32.

Sixth, Plaintiff argues that there is no uncertainty about the fact that the SSET members admitted their lack of qualifications at the January 27, 2010 debriefing. *Id.* at 48–49. For this reason, the Government conveniently omits the resumés and qualifications from the Administrative Record. *Id.*

### D. The Government's Reply.

The Government replies that Plaintiff has applied the wrong standard of review: the issue is not whether the Air Force's actions were "warranted," but whether they were "rational." Gov't Reply at 2. Plaintiff also confuses the standard of review with the burden of proof. *Id.* Although agency decisions are reviewed for rationality, it is the plaintiff's burden to show that agency decisions are irrational by clear and convincing evidence. *Id.* Plaintiff has failed to satisfy this burden. *Id.*

The Government also contests several factual assertions made by Plaintiff. *Id.* at 3. First, the Government did not admit to not performing an independent investigation. *Id.* (citing Pl. Resp. at 3). Moreover, despite Plaintiff's insistence, neither of the two GAO decisions at issue determined that a gratuity was paid nor did the GAO order the Air Force to take any corrective action. *Id.* at 3–4. In addition, Plaintiff misstates the timing of the facts. *Id.* at 6. The draft RFP was not posted on January 26, 2009, but on March 17, 2009, and the final RFP was not published until April 20, 2009. *Id.* (citing AR Tab 10, at 1920). Lt. Col. E. was transferred to Germany in February of 2009, well before the draft RFP was published. *Id.* (citing AR Tab 10, at 1920, 1924–25). Plaintiff also surmises that a "simple statement" from Lt. Col. E. about the incumbent contractor would influence the SSET against Chenega. *Id.* (quoting Pl. Resp. at 8). Since Offeror 3 and DRG proposed hiring incumbent contractor

---

**29.** Plaintiff also argues that the Government offers nothing more than the mere assertions of Lt. Col. E. and Mr. S. to establish that Lt. Col. E. paid face value for the Super Bowl tickets. Pl. Resp. and Reply at 9–10. Notably, only Mr. S.

testified that Lt. Col. E. paid cash for the tickets and no records of this transaction exist. *Id.* at 10. In addition, the Air Force never considered the substantial difference between the tickets face value and fair market value. *Id.*

personnel, both would have been negatively impacted by such a statement. *Id.* In fact, contrary to Plaintiff's contention, Offeror 3 did have relevant past performance as a prime contractor. Accordingly, Offeror 3 did not unduly benefit from Amendment 2 to the Solicitation. *Id.* In any event, Amendment 2 was issued more than a month after Lt. Col. E. was transferred to Germany, evidencing that he had no involvement with this aspect of the procurement. *Id.* at 6–7.

Regarding allegations of bias, the Air Force considered the relevant evidence, determined the allegations were unfounded, and articulated a reasonable explanation for its actions. This determination is entitled to deference. *Id.* at 5–6. Chenega's [redacted] challenges to the ratings amount to "minutiae of the procurement ... that the court will not second guess." *Id.* quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir.1996).

Plaintiff's dispute with the agency holding discussions with DRG and Offeror 3 are equally unavailing. Gov't Reply at 7. "[D]iscussions and negotiations that occur *after* the establishment of the competitive range ... may, at the Contracting Officer's discretion, result in the offeror being allowed to revise its proposal." FAR 52.215–1. The Air Force reserved the right to hold discussions with offerors in the competitive range. Gov't Reply at 7 (citing AR Tab 2, at 171). Plaintiff was eliminated from the competitive range, because it did not meet minimum Solicitation requirements and was not among the most highly rated proposals. *Id.* at 8. Accordingly, the Air Force had no obligation to enter into discussions with Chenega. *Id.* In addition, the Air Force fully documented its rationale for engaging in discussions with other offerors in accordance with FAR 15.306(a)(3). *Id.* (citing AR Tab 3, at 498, 553; AR Tab 7, at 1690).

### E. The Court's Resolution.

#### 1. Plaintiff Failed To Establish Bias.

■ Government officials are presumed to act in good faith. *See Savantage Fin. Servs., Inc.,* 595 F.3d at 1288 ("As an initial matter, government officials are presumed to act in good faith."). To prevail on an allegation of bias, a plaintiff bears the burden of overcoming this presumption of good faith by "almost irrefragable" proof. *See Galen Med. Assoc. Inc.,* 369 F.3d at 1337 (analyzing an allegation of bias and holding that "[i]n order to prevail on an allegation of bad faith, [Plaintiff] must show 'almost irrefragable' proof") (citation omitted). The United States Court of Appeals for the Federal Circuit has held that "irrefragable proof" is to be adjudicated using the clear and convincing evidence standard. *Id.* at 1330 ("Almost irrefragable proof amounts to clear and convincing evidence." quoting *Am–Pro Protective Agency, Inc. v. United States* ("*Am–Pro*"), 281 F.3d 1234, 1239–1240 (Fed. Cir.2002)). Our appellate court described in *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed. Cir.1993), the clear and convincing evidence standard as:

> Impos[ing] a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable.*'

*Id.* at 1191.

■ In addition, establishing that a procurement official acted in bad faith requires a showing "of some specific intent to injure the plaintiff." *Savantage Fin. Servs., Inc.,* 595 F.3d at 1288 (quotations omitted).

■ The April 12, 2010 Complaint alleges that the SSET was biased against Plaintiff, based on the "self-evident" fact that the Air Force assessed [redacted] in rating Chenega's proposal. Pl. Mot. at 44; Pl. Resp. & Reply at 49. Plaintiff's bias allegations are not founded on "hard facts," but on disagreements with the Air Force's evaluation of Plaintiff's proposal or conjecture. Pl. Resp. & Reply at 49 (arguing that the SSET's bias is "self-evident from the [redacted]" assigned to Plaintiff's proposal). Disagreement with technical evaluations, however, is not sufficient to satisfy a threshold showing either of a motivation for a Govern-

ment employee to have acted in bad faith or of conduct that is hard to explain absent bad faith. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n. 2 (Fed.Cir.2003) ("In this case, [Plaintiff] has pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome the presumption that the contracting officer acted in good faith.").

 More importantly, Plaintiff offered no evidence to demonstrate that the SSET acted with any specific intent to injure Chenega. *See Savantage Fin. Servs., Inc.*, 595 F.3d at 1288. Instead, Plaintiff attempted to show bias through the fact that Lt. Col. E. at one time supervised some of the SSET members and therefore presumably "had the means to improperly influence" them. Pl. Resp. at 7–8. Speculation and innuendo, however, consistently have been rejected as insufficient to overcome the presumption that procurement officials act in good faith. *See T & M Distrib., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed.Cir.1999) (holding that "just bald assertions and speculation of wrongful conduct" could not defeat a summary judgment motion); *see also C.A.C.I.*, 719 F.2d at 1582 (reversing the trial court's holding of government wrongdoing, because it was based on "suspicion and innuendo, not on hard facts."); *ARINC Eng'g Servs., LLC v. United States*, 77 Fed.Cl. 196, 202 (2007) ("[M]ere inference or suspicion of an actual or apparent conflict is not enough[.]").

Likewise, Plaintiff's claim that the Air Force "shifted favoritism to DRG" to avoid

confronting Lt. Col. E.'s conduct, has no basis in the Administrative Record.

As for the claims that the "GAO gratuitously advised the [Air Force] that it could avoid the 'ugliness' of confronting both the gratuity issue and bias claim" by awarding the Contract to DRG, the February 4, 2010 letter from GAO informed the parties it was limiting the protest to exclude Chenega's "allegations of bias and related arguments regarding unequal treatment," because they "are premised on unreasonable assumptions and speculation [and] they do not establish likelihood that the protestor will prevail on this claim of improper agency action." Pl. Mot. to Supp. at Ex. 3. In addition, Plaintiff's counsel acknowledged during oral argument that there is no record evidence of such a statement.[30] 7/19/10 TR at 35.

For these reasons, the court has determined that Plaintiff has failed to establish bias by the Air Force.

**2. Plaintiff Failed To Establish A Violation Of Federal Acquisition Regulation 3.101–2—Acceptance Of A Gratuity And 5 C.F.R. § 2635.203.**

To succeed in establishing a violation of FAR 3.101–2, Plaintiff must show by "clear and convincing" evidence[31] that Lt. Col. E.'s receipt of Super Bowl tickets from Mr. S. constituted "a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381; *see also Am–Pro*, 281 F.3d at 1239 (holding that the presumption of good faith and the resulting clear and convincing standard "applies only in the situation where a government official allegedly engaged in fraud or in some other quasi-criminal wrongdoing."). The majority

---

**30.** Plaintiff also did not move for discovery or supplementation of the Administrative Record with evidence to support this claim. Pl. Mot. to Supp., *Chenega Mgmt. LLC*, 10–221, ECF No. 16, 17 (Fed. Cl. May 12, 2010).

**31.** Plaintiff asserts that Lt. Col. E.'s conduct violated 18 U.S.C. § 201, a criminal statute. Pl. Mot. at 42. The United States Court of Appeals for the Federal Circuit has held that a "quasi-criminal" claim requires the application of the clear and convincing standard. *See Am–Pro*, 281 F.3d at 1241; *see also TRW Envtl.*, 18 Cl.Ct. at 43 (construing a conflict of interest claim under the "clear and convincing" evidence standard). Re-

cently, the United States Court of Federal Claims also has held that "clear and convincing" evidence is required to prove a violation of FAR 3.101–1, *i.e.*, "[g]overnment business shall be conducted in a manner above reproach ... with complete impartiality and with preferential treatment for none." *ViroMed Labs., Inc. v. United States*, 87 Fed.Cl. 493, 504 (2009).

In light of Plaintiff's allegation that a government official accepted an illegal gratuity that is tantamount to an allegation of "quasi-criminal wrongdoing" or "bad faith" the court has determined that the "clear and convincing" standard applies.

of Plaintiff's argument relies on conflict of interest cases for the proposition that claims related to the integrity of the procurement process obviate the need to show prejudice. Pl. Mot. at 39–42; Pl. Resp. & Reply at 5.

■ Plaintiff, however, glosses over the first step in the analysis that requires a showing by clear and convincing evidence of an acceptance of an illegal gratuity. *See Am–Pro*, 281 F.3d at 1239. Plaintiff relies on *TRW Envtl.*, but overlooks the fact that the court in that case first engaged in an extensive analysis to determine whether the protestor had established a violation of law by "clear and convincing" evidence. *See TRW Envtl.*, 18 Cl.Ct. at 44–64 (analyzing whether the evidence supported the allegation of a conflict of interest violation). Only after determining that this higher evidentiary burden was met did the court conclude that the "extremely drastic" remedy of injunctive relief was appropriate. *Id.* ("Having concluded that plaintiff has established, by clear and convincing evidence, that 42 U.S.C. § 7216 was violated, we now turn to the question-whether that proof is, *ipso facto*, sufficient grounds upon which to grant the requested injunctive relief").

In this case, Plaintiff has failed to meet this threshold evidentiary burden. Plaintiff offers no evidence to counter the Air Force's finding that Lt. Col. E. paid full market value for the tickets at issue. AR Tab 10, at 1919. Although FAR 3.101–2 does not define the term "gratuity," 5 C.F.R. § 2635.203, Standards of Ethical Conduct for Employees of the Executive Branch, excludes "anything for which market value is paid by the [government] employee" from the definition of an illegal gift or gratuity. *See* 5 C.F.R. § 2635.203(b)(9). In addition, Plaintiff's counsel conceded at oral argument that, "if you paid face value, then I think you've complied with the regs." 7/19/10 TR at 30. Plaintiff next attempts to establish a violation of FAR 3.101–2 by attacking the credibility of the declarations Lt. Col. E. and Mr. S. Pl. Mot. at 8, 53–54: Pl. Resp. & Reply 3–4. But Mr. Vuckovich's Declaration only attests to seeing Lt. Col. E. in line with Mr. S. for Super Bowl tickets, a fact not contested. AR Tab 10, at 1960. The court is not at liberty

to assume this meeting was evidence of illegal conduct. *See Beta Analytics Int'l., Inc.*, 61 Fed.Cl. at 226 ("Innuendo or suspicion is not enough to demonstrate bad faith[.]"). In sum, Plaintiff has proffered only the uncorroborated statement of Mr. Vuckovich and unfounded suppositions about what Lt. Col. E. may have done. Pl. Resp. & Reply, at 7–8. This showing, however, falls far short of the "hard facts" necessary to establish by "clear and convincing" evidence that the procurement was tainted by an illegal gratuity. *See CACI*, 719 F.2d at 1582.

■ Even if there were sufficient evidence to establish that Lt. Col. E.'s conduct violated FAR 3.101–2, Plaintiff did not show any resulting prejudice. *See Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1134 (Fed.Cir.1998) (holding that "only a clear and prejudicial violation of a procurement statute or regulation warrants relief") (internal quotations omitted). Contrary to Plaintiff's argument, the United States Court of Appeals for the Federal Circuit consistently has held that, when challenging a procurement on the basis of a statutory or regulatory violation the protestor "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir. 2000); *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").

■ Plaintiff attempts to avoid showing prejudice by arguing the applicability of conflict of interest cases, where there is no requirement to show prejudice. Pl. Mot. at 39–41. The United States Court of Appeals for the Federal Circuit, however, has applied a "clear *and prejudicial* violation standard" to bias and conflict of interest allegations. *See Galen Med. Assoc. Inc.*, 369 F.3d at 1330–31 (emphasis added). Moreover, in each of the conflict of interest cases cited by Plaintiff, the statute or regulation at issue necessarily required the court first to find that the alleged violator was substantially involved in the transaction or the set

of circumstances giving rise to the conflict. *See e.g., United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 551–52, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (where the principal actor at issue was a "key representative" who qualified as an "officer or agent of the United States *for the transaction of business* ") (emphasis added); *see also TRW Envtl.*, 18 Cl.Ct. at 62 (holding that the contractor "was directly, materially, and substantially involved in a Department proceeding, relating to the ... procurement, within the prohibitive period"); *K & R Eng'g Co., Inc. v. United States*, 616 F.2d 469, 472 (Ct.Cl.1980) (holding that a government official "participated personally and substantially in various aspects of the letting, administration, and performance of the three contracts here involved") (internal quotations omitted). In other words, although actual corruption need not be established, there must be some nexus between the government official's interests and the transaction at issue or, by definition, no conflict of interest can exist. *See Galen Med. Assocs., Inc.*, 369 F.3d at 1336 ("For even an appearance of a conflict of interest to exist, a government official must at least appear to have some stake in the outcome of government action influenced by that individual."); *see also ARINC Eng'g Servs.*, 77 Fed.Cl. at 202.

Lt. Col. E.'s role was limited to providing workload data from the incumbent contract and reviewing draft SOW instructor duty descriptions and educational requirements.[32] AR Tab 10, at 1917. In this case, Lt. Col. E. had no role in evaluating proposals. AR Tab 10, at 1917–21, 1930–31. Lt. Col. E. was not part of the Command, (ACC TRSS) that issued the Solicitation, but left his post with a different command, the 607 ACS (a recipient of the services provided under the Contract) prior to the Solicitation being published and well before the Air Force's evaluation of

proposals and award of the Contract. AR Tab 10, at 1930. In addition, Lt. Col. E. did not select nor supervise any members of the SSET who evaluated the proposals. AR Tab 10, at 1918–22, 1930. Therefore, Plaintiff has not established how his limited involvement favored one offeror over another.

As for the February 2009 conversation between Mr. Vuckovich and Lt. Col. E. concerning Mr. Vuckovich's employment future, even if the court were to accept Mr. Vuckovich's version, Plaintiff failed to demonstrate how Lt. Col. E. influenced or could have influenced the evaluation or final "best value" Source Selection Decision. The February 2009 conversation took place well before the Solicitation was issued on April 2009. Lt. Col. E. left the 607 ACS shortly thereafter. AR Tab 10, at 1921, 1925; AR Tab 2, at 72. Likewise, Plaintiff does not show that Lt. Col. E. had any involvement in issuing Amendment 2 to the Solicitation that changed the Government's assessment criteria of past performance. Pl. Resp. & Reply at 9. Lt. Col. E. was not assigned to the 607 ACS when Amendment 2 was issued and the Administrative Record confirms that he had no involvement with the drafting or issuing that Amendment. AR Tab 10, at 1920–21. Therefore, the court has determined that Lt. Col. E.'s attenuated connection to this procurement was not relevant to Plaintiff's elimination from the competitive range.

The cases relied on by Plaintiff hold only that where the Government determines that a procurement or contract is tainted by fraud, illegality, or the appearance of impropriety, it has broad discretion to take corrective action. *See Compliance Corp. v. United States*, 22 Cl.Ct. 193, 203 (1990) (observing that contracting officers have "broad discretion to oversee the procurement process and to protect its integrity from the appearance of impropriety").[33] And, that is what hap-

---

**32.** The additional education requirement, for which Lt. Col. E. purportedly advocated—*i.e.*, completion of the Advanced Weapon Director Course—was only a "desired" qualification in the final Solicitation that was suggested to all offerors. AR Tab 2, at 231. On the other hand, Mr. Vuckovich was, by his own admission, "the only non-government person in the 607 ACS" who met this qualification. AR Tab 10, at 1959.

Therefore, this requirement did not disadvantage Plaintiff.

**33.** For example, Plaintiff cites to *United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), but in that case the United States Supreme Court held only that the Government could cancel contracts made in violation of the Anti–Kickback Act, "even though the

pened here. The Air Force appointed an experienced procurement official to investigate Plaintiff's allegations about Lt. Col. E.'s conduct. AR Tab 10, at 1919. After an initial investigation, she concluded that OSI "had not been able to substantiate any of the claims and anticipated no further action[,]" that the procurement was not tainted by illegal gratuity and can could proceed in the normal course. AR Tab 10, at 1917–19. Therefore, the Air Force's investigation and 12/3/09 Air Force Memorandum "provided a coherent and reasonable explanation of its exercise of discretion." *Centech Group, Inc.*, 554 F.3d at 1037. Although Plaintiff may disagree with this conclusion, that is not sufficient to disturb the agency's decision. *See Savantage Fin. Servs., Inc.*, 595 F.3d at 1286 ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.").

For these reasons, the court has determined that Plaintiff failed to establish that the Air Force engaged in bias.

### 3. Plaintiff Failed To Establish A Violation Of Federal Acquisition Regulation 1.602–2—Unequal Treatment.

 Plaintiff also alleges that the SSET treated Chenega's proposal unequally during the initial evaluation that led to its elimination from the competitive range. Pl. Mot. at 44–46. In support, Plaintiff engages in a lengthy "analysis" challenging all [redacted]. Pl. Mot. at 11–34; Pl. Resp. & Reply at 10–48. FAR 1.602–2 requires contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment." 48 C.F.R. § 1.602–2. In addition, "the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing." *HWA, Inc. v. United States*, 78 Fed.Cl. 685, 697 (2007) (quoting *Hunt Bldg. Co.*, 61 Fed. Cl. at 273). As such, the United States Court of Federal Claims has held that a "contracting agency must treat all offerors

equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of America v. United States*, 56 Fed.Cl. 377, 384 (2003), *aff'd* 365 F.3d 1345 (Fed.Cir.2004). Equal treatment, however, does not require that all proposals be treated the same. *See* 48 C.F.R. § 1.102–2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."). In particular, "a contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." *Birch & Davis Intern., Inc. v. Christopher*, 4 F.3d 970, 973 (Fed.Cir.1993). Technical ratings of proposals are "discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449.

 This court has held that unequal treatment claims are the "quintessential example of conduct which lacks a *rational basis*." *Hunt*, 61 Fed.Cl. at 273 (emphasis added). Therefore the relevant inquiry here is whether the "Air Force unreasonably downgraded [Chenega's] technical proposal for deficiencies that are substantively indistinguishable from those found in the proposals of the other offerors who remained in the competitive range." *Id.*

 The SSET's evaluation primarily focused on three primary deficiencies in [redacted]: the lack of specificity; numerous mathematical errors; and inconsistent statements. AR Tab 7, at 1720–30. Although the SSET scrutinized Plaintiff's proposal carefully, the same precision and consistency was applied to all proposals. *See* AR Tab 7, at 1707–09, 1713–119, 1733, 1735, 1738–39, 1744–45, 1748 (noting weaknesses in other proposals, such as erroneous calculations, inconsistent proposal provisions, and lack of detail). In fact, two other offerors, [redacted] and [redacted], had far fewer weaknesses as-

party seeking enforcement ostensibly appears entirely innocent." *Id.* at 144–48, 87 S.Ct. 350. Likewise in *Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1279 (Fed.Cir.1985), the United States Court of Appeals for the Federal Circuit held that the Government could terminate a contract even if only a small part of the

contract was tainted by fraud. Likewise, in *Brown Const. Trades, Inc. v. United States*, 23 Cl.Ct. 214, 215 (1991), the United States Claims Court held that the Government could terminate the entire contract, although the bribe at issue concerned a minor modification. *Id.* at 215.

sessed than [redacted], but received the same or lower final ratings than Plaintiff. AR Tab 7, at 1706, 1712, 1730.

Regarding the weaknesses assessed for mathematical and typographical errors, the RFP advised offerors "to submit initial proposals that are fully and clearly acceptable without the need for submission of additional information" and that the final determination of whether a proposal was acceptable or unacceptable may be made "solely on the basis of the initial proposal as submitted." AR Tab 2, at 177. Plaintiff's pique that several of these errors could have easily been corrected through clarifications neglects the fact "[c]larifications ... *may* occur when award without discussions is contemplated." 48 C.F.R. § 15.306(a)(1) (emphasis added); *see also L-3 Commc'ns EOTech, Inc. v. United States,* 83 Fed.Cl. 643, 658 (2008) ("The decision to engage in clarifications is discretionary ... the decision to not seek clarifications from an offeror must be reasonable under the circumstances of the procurement") (quotations omitted). More importantly, many of the errors Plaintiff described as immaterial were determined by the SSET to evidence Plaintiff's misunderstanding of the requirements of the Solicitation.[34] *See, e.g.,* AR Tab 7, at 1721 (detailing a weakness for a proposing fewer man-years than Plaintiff estimated was required to accomplish the task); AR Tab 7, at 1722 (detailing a significant weakness for inconsistent or confusing workload definitions that would have included time for blood donations and jury duty as both "work required, but not related to performance" as well as "ancillary workload factors," "completed by the employee in support of the contract"). The Air Force also did not engage in clarifications with any offeror, but rather, proceeded to discussions under FAR 15.306(d). AR Tab 7, at 1784–87. Given

Chenega's significantly inferior ratings, the Air Force's decision not to engage in clarifications was reasonable.

 Likewise, the SSET's lack of specificity criticism is consistent with the RFP's requirement that proposals would be evaluated on "the methodology used and the level of detail provided." AR Tab 2, at 182; *see also* AR Tab 2, at 183 (variously calling for "detailed description[s]," "detailed lists," and "specific methods and procedures"). The SSET also provided examples where Plaintiff could have been more specific. AR Tab 7, at 1720–30. Although Plaintiff insists that many these examples fell outside the scope of the stated evaluation criteria, procuring agencies traditionally have been afforded "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 499 (1999) (citing JOHN CIBINIC JR. & RALPH C. NASH JR., FORMATION OF GOVERNMENT CONTRACTS 830 (3d ed. 1998)). Given the broad evaluation criteria, the SSET's criticisms fell well within the agency's discretion.[35] *See Hydro Eng'g Inc. v. United States,* 37 Fed. Cl. 448, 471 (1997) (holding that a protestor must show that proposals were evaluated "on significantly different basis than announced in the solicitation" to succeed on this type of claim). Moreover, the SSET did not disparately assess weaknesses on these grounds, but consistently assigned weaknesses to other offerors for similar lack of detail. AR Tab 7, at 1717–18, 1741. In sum, Plaintiff's remaining argument amounts to no more than a disagreement about the SSET's assessment of the proposal's adequacy that "fall[s] far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary

---

34. The court acknowledges that some of the SSET's findings could be perceived as "picky." *See e.g.,* AR Tab 7, at 1726 (assigning a weakness for an acknowledged typographical error). Nevertheless, given the significant number of justified negative ratings, these examples of error are insufficient to render an otherwise legitimate evaluation arbitrary and capricious. *See Hamilton Sundstrand Power Sys.,* 75 Fed.Cl. at 518 (holding that one instance of unequal treatment was not sufficient to invalidate the entire procurement).

35. The weaknesses assessed for lack of detail regarding the roles and responsibilities of prime and sub-contractors also are consistent with the stated evaluations criteria. AR Tab 2, at 183 ("The Government will evaluate the contractor's proposal of the descriptions of all prime and subcontractor responsibilities including its proposed organization chart that notes the responsibilities of each").

and capricious." *JWK Int'l. Corp. v. United States*, 52 Fed.Cl. 650, 660 (2002), *aff'd* 56 Fed.Appx. 474 (Fed.Cir.2003).

Many of Plaintiff's claims of unequal treatment mistakenly compare "weaknesses" assessed during the initial evaluation with the "ENs" issued to Offeror 3 and DRG in the post-competitive range determination discussions. Pl. Resp. & Reply at 25–28, 35–39; 48 C.F.R. 15.306(d) ("When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions."). The ENs Plaintiff cites as evidence of unequal treatment initially were assessed as weaknesses against DRG and Offeror 3 during the competitive range determination, but subsequently were addressed as an EN during discussions. *Compare* AR Tab 7, at 1717–20 (DRG weaknesses assessed) *with* AR Tab 3, at 555–72 (DRG's ENs); *compare also* AR Tab 7, at 1738–43 (Offeror 3 weaknesses assessed) *with* AR Tab 3, at 501–22 (Offeror 3's ENs). Once the competitive range is determined, the contracting officer has a great deal of latitude in the type and nature of any follow-on negotiations. See FAR 15.306(d)(3).[36] Therefore, Plaintiff did not receive unequal treatment regarding the weaknesses assessed during the initial evaluation. DRG and Offeror 3 simply had far fewer weaknesses than Plaintiff and, as a consequence, their proposals were selected for the competitive range. AR Tab 7, at 1717–20, 1738–43, 1720–30 (finding 5 weaknesses in DRG proposal, 6 weaknesses in Offeror 3's proposal, and 42 weaknesses and deficiencies in Chenega's proposal). The fact that SSET addressed Offeror 3 and DRG's weaknesses in EN's is not evidence of unequal treatment, but indicative of a procurement carried out in accordance with FAR 15.306(d)(3). *Id.* As for the SSET's assignment of a deficiency against Plaintiff's proposal for multiple weaknesses, that evaluation is consistent with both the FAR and RFP's definition of a deficiency. *See* 48 C.F.R. § 15.001 (" 'Deficiency' is a material failure of a proposal to meet a Government requirement *or a combination of significant weaknesses in a proposal* that increases the risk of unsuccessful contract performance to an unacceptable level.") (emphasis added); *see also* AR Tab 2, at 182 (incorporating the AFFARS 5315 definitions matching the FAR definitions).

For these reasons, the court has determined that Plaintiff has failed to establish a violation of FAR 1.602–2.

### 4. Plaintiff Failed To Establish The Air Force Evaluators Were Not Qualified.

▮▮▮ Plaintiff's final argument is that the Air Force appointed unqualified evaluators to the SSET, but Plaintiff does not cite a single case that set aside a protest on that basis, without a showing of conflict of interest or bad faith. In fact, the United States Court of Federal Claims has held that "[t]he composition of an agency's evaluation team is a matter in which the agency has great discretion." *Software Eng'g Servs., Corp. v. United States*, 85 Fed.Cl. 547, 556 (2009); *see also Decision Matter of: IMLCORP LLC; Wattre Corporation*, B–310582, B–310582.2, B–310582.3, B–310582.4, B–310582.5, 2008 CPD ¶ 15, 2008 WL 104207 (Comp.Gen.2008) (that the GAO has "long found that the selection of individuals to serve as evaluators is a matter within the discretion of the agency," and will not review allegations "concerning the evaluators' qualifications or the composition of evaluation panels absent a showing of possible fraud, conflict of interest, or actual bias on the part of evaluation officials[.]"); *see also Matter of: Info. Ventures, Inc.*, B–401448.5, B–401448.6, 2010 WL 3133639, at

---

36. FAR 15.306(d)(3) provides:

At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3).

*4 (Comp.Gen.) (same); *Washington Sch. of Psychiatry*, B–189702, 78–1 CPD ¶ 176, 1978 WL 10175 (Comp.Gen.) (same).

■ Plaintiff relies exclusively on a comment allegedly made by an unnamed Air Force official at the January 27, 2010 post-award briefing that the SSET could have accessed additional subject matter expertise during the evaluation if the SSET felt it was necessary, but did not do so. Pl. Mot. at 55. This allegation, however, is consistent with the Government's position that the evaluators were fully qualified and did not require outside expertise. Gov't Mot. at 70–71. Moreover, having already determined that Plaintiff failed to establish bias or bad faith, an unsubstantiated claim of evaluator incompetence does not warrant disturbing the agency's "great discretion" to select the members of the SSET. *See Software Eng'g Servs., Corp.*, 85 Fed.Cl. at 547, 556 (2009) ("[T]he composition of an agency's evaluation team is a matter in which the agency has great discretion.").

For these reasons, Plaintiff has failed to establish that members of the SSET were not qualified.

## VII. CONCLUSION.

For reasons discussed herein, Plaintiff's May 21, 2010 Motion For Judgment On The Administrative Record is denied. The Government's June 18, 2010 Cross Motion For Judgment On The Administrative Record is granted. Accordingly, the Clerk of the Court for the United States Court of Federal Claims is directed to enter judgment on behalf of the Government.

No costs.

**IT IS SO ORDERED.**

